UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

LUTFALLAH T. SAWABINI,

                        Plaintiff,

        -against-                                    3:15-CV-692 (LEK/DEP)

EDWARD MCGRATH, *et al.*,

                        Defendants.

_____

## MEMORANDUM-DECISION AND ORDER

## I.    INTRODUCTION

        Pro se plaintiff Lutfallah T. Sawabini brought this action against (among other

individuals and entities that are no longer parties to this case) defendants Harold Southworth,

Mary McCarthy, Michael Hodgman, and Edward McGrath (collectively, the "Bassett

Defendants"); the New York State Division of Human Rights ("DHR"), Helen Torres, Victor

DeAmelia, Caroline Downey (collectively, the "State Defendants"); and William Carentz. Dkt.

Nos. 1 ("Complaint"), 7 ("Amended Complaint").[1] Presently before the Court are the State

Defendants' motion for judgment on the pleadings, motions for summary judgment filed by the

Bassett Defendants and Carentz, and Sawabini's cross-motion for summary judgment. Dkt. Nos.

82 ("State Motion"), 104 ("Carentz Motion"), 115 ("Bassett Motion"), 116 ("McGrath Motion"),

106 ("Sawabini Cross-Motion"). For the reasons that follow, the Court grants the motions filed

by the State Defendants and Carentz, grants in part and reserves decision on the remainder of the

Bassett Motion, and denies Sawabini's Cross-Motion.

_____

        [1]  Edward McGrath moved for summary judgment separately from the other Bassett
Defendants. McGrath Mot. Nevertheless, the Court will collectively refer to McGrath,
Southworth, McCarthy, and Hodgman as the Bassett Defendants.

## II. BACKGROUND

### A. Factual Background

#### 1. The Alleged False Arrest

Sawabini is a licensed pharmacist who was continuously employed for over fifty years in various capacities from age nineteen to seventy. Am. Compl. at 6; Dkt. No. 106-1 ("Sawabini Cross-Motion Affidavit") at 2.[2] In 2014, Sawabini applied for a risk management position at O'Connor Hospital, an affiliate of the Bassett Healthcare Network. Dkt. No. 117-1 ("Sawabini Opposition Declaration") at 7; Dkt. 115-4 ("Bassett Statement of Material Facts") ¶ 1. After Sawabini was denied the position, several O'Connor employees reported to Edward McGrath—the Senior Director of Operations at O'Connor Hospital—that Sawabini was making threatening statements. Dkt. No. 115-3 ("McGrath Declaration") ¶¶ 1–2. On or about April 14, 2014, McGrath called Sawabini and requested that he stop his behavior, and McGrath followed up by sending Sawabini a letter on April 15, 2014. Id. ¶ 3; Dkt. No. 115-3 ("Southworth Declaration") ¶ 6. McGrath also reported the threats to Southworth, the Network Manager of Public Safety. McGrath Decl. ¶ 4; Southworth Decl. ¶ 3. On April 22, 2014, another employee reported that Sawabini was continuing to make threatening statements. Southworth Decl. ¶ 7. Sawabini denies that he threatened O'Connor employees, and he claims that McGrath is lying about his conduct. Sawabini Opp'n Decl. at 3–4, 7.

Southworth reported Sawabini's threatening phone calls to Dr. Celeste Johns, Bassett's Chief of Psychiatry and the designee of the Director of Community Services for New York

_____

[2] The page numbers for this document refer to those generated by the Court's electronic filing system ("ECF").

Mental Hygiene Law. Southworth Decl. ¶ 8; Dkt. No. 115-3 ("Johns Declaration") ¶ 4.[3]

Southworth told Dr. Johns that "it was [his] belief, based on [his] training and experience, that

[Sawabini] presented a substantial risk of harm to himself or others." Southworth Decl. ¶ 9. New

York Mental Hygiene Law section 9.45 states that:

> The director of community services or the director's designee shall
> have the power to direct the removal of any person . . . to a
> hospital . . . [if] a licensed physician, health officer, peace officer or
> police officer reports to him or her that such person has a mental
> illness for which immediate care and treatment in a hospital is
> appropriate and which is likely to result in serious harm to himself or
> herself or others.

Pursuant to this authority, Dr. Johns completed a section 9.45 form after finding reasonable cause

to believe that Sawabini was suffering from a mental illness that posed a danger to himself or

others. Johns Decl. ¶ 5. Sawabini appears to suggest that Southworth never communicated with

Dr. Johns, and that Southworth fabricated Dr. Johns's role after Southworth had Sawabini

confined. Sawabini Opp'n Decl. at 12. Yet Sawabini presents no admissible evidence to support

this assertion.

After completing the section 9.45 form, Dr. Johns handed it to Mary McCarthy, a

registered nurse in the Crisis Center, who then faxed it to the Sidney Police Department. Johns

Decl. ¶ 6; Dkt. No. 115-3 ("McCarthy Declaration") ¶¶ 3–8. On April 22, 2014, the Sidney

Police Deparment transported Sawabini without restraint to Bassett Hospital. Bassett SMF ¶ 10.

Once at the hospital, Sawabini was evaluated by Dr. Johns and Dr. Michael Hodgman, an

attending physician at Bassett. Johns Decl. ¶ 7; Hodgman Decl. ¶¶ 1, 3. Dr. Hodgman concluded

that "although [Sawabini] suffered from hypomania, he did not pose an immediate risk of

---

[3] Dr. Johns is not a defendant in this action. Docket.

substantial harm to himself or others." Hodgman Decl. ¶ 6. Dr. Johns provided a similar diagnosis. Johns Decl. ¶ 7. Accordingly, Dr. Hodgman ordered Sawabini's release. Hodgman Decl. ¶ 8. Sawabini, for his part, claims that Southworth "intended to ask" Dr. Johns for Sawabini's "permanent detainment." Sawabini Opp'n Decl. at 6. Sawabini also appears to suggest that because Dr. Johns was aware that the Bassett Defendant were falsely arresting him, she let him leave. Id. at 9. And according to Sawabini, Dr. Johns promised to report Southworth for his involvement in the false arrest. Id. at 10.

Sawabini further alleges that William Carentz, his psychologist, conspired with the Bassett Defendants to have him confined while Carentz was on vacation in Florida. Sawabini Cross-Mot. Aff. at 5–7. Carentz is a licensed clinical social worker who maintains a private practice. Dkt. No. 104-2 ("Carentz Affidavit") ¶ 2. Carentz treated Sawabini as a private client between February and June 2014. Id. ¶ 3. Carentz denies involvement with any of the events surrounding Sawabini's confinement at Bassett Hospital. Carentz Aff. ¶¶ 5–8. Sawabini fails to explain the basis for his knowledge about Carentz's activities during his Florida vacation; thus, there is no admissible evidence in the record supporting Sawabini's assertion that Carentz acted in concert with the Bassett Defendants to confine him.

### 2. *The DHR Proceedings*

After waiting for some time to hear back regarding his application for the risk management position, Sawabini filed a discrimination complaint with the DHR. Am. Compl. at 6–7.[4] At proceedings in front of the DHR, Sawabini objected to the failure to swear in Barbara Greene, McGrath, and Jane Doe 1, a telephone operator at O'Connor Hospital, during a February

---

[4]  The page numbers for this document refer to those generated by ECF.

6, 2015 telephone conference at which an unfavorable decision was rendered. Id. at 47. Sawabini also alleges that several individuals lied during the course of the DHR inquiry, including Greene and McGrath. Id. at 20, 22. In particular, Greene stated that Sawabini's resume did not contain enough "evidence of expertise in [s]uch management." Id. at 22. Sawabini believes that McGrath has a habit of lying due to the lay opinions of various security guards at the Delaware City Court; the chief of police of Delhi, New York; and the chief of emergency services of Delaware County. Id. at 46–47. Sawabini unsuccessfully brought these allegations to DeAmelia, the regional director for the DHR, and Torres, an investigator for the DHR. Id. at 47–48. He asked Torres to recuse herself due to her refusal to "see the liability" in his case. Id. at 21.

Sawabini states that Victor DeAmelia, the regional director for the DHR, issued faulty decisions, that he did not read Sawabini's rebuttal, and that Caroline Downey, general counsel for the DHR, was complicit in denying Sawabini his ability to have his case heard in front of the DHR. Id. at 28, 45, 48. Torres allegedly failed to investigate the confinement, interview Jane Doe 1, question Denise Pinter, a member of the human resources department at O'Connor hospital, as to why Sawabini's alleged threats were relevant, order Sawabini's arrest report, or call Southworth, McCarthy, Hodgman, Vance Brown, or Richard Brown. Id. at 48–49. In sum, the DHR determination was "[c]apricious, arbitrary and abusive." Id. at 27. Sawabini states that the DHR considered evidence where various defendants admitted to the conduct he alleges as well as evidence of discrimination, intent to inflict emotional distress, and other malicious conduct. Id. at 28. Sawabini specifically alleges that Downey was unresponsive, failed to appear at least once in state court, and "team[ed] with all defendants to feed her ego." Id. at 50–51.

**B. Procedural History**

Sawabini filed this action on June 8, 2015, asserting claims arising under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. Compl. Sawabini filed an Amended Complaint on September 21, 2015, adding Tri-Town Hospital, the Bassett Defendants, the State Defendants, William Carentz, Greene, Pinter, Carlton Rule, and eleven John and Jane Does as defendants. Am. Compl. at 6–14. Several defendants then moved to dismiss, and on September 8, 2016, this Court granted in part and denied in part these motions. Dkt. No. 69 ("September Order") at 51–53. The Court held that the following claims survived: (1) the false arrest claims under 42 U.S.C. § 1983 against McGrath, Carentz, Hodgman, Southworth, and McCarthy, and (2) the due process claims against the State Defendants under § 1983. Id. at 52. Further, because the Court entertained doubts as to its jurisdiction over the New York State Human Rights Law ("NYSHRL") claims, it directed Sawabini to file the full decision from the DHR and explain why the Court could exercise jurisdiction over the claim. Id. 52–53. On October 19, 2016, the Court dismissed the NYSHRL claims because Sawabini's submission "clarifie[d] that his complaint was dismissed on the merits and does not fit into one of the . . . exceptions [for exercising jurisdiction over NYSHRL claims that have already been brought before the DHR]." Dkt. No. 75 ("October Order") at 2. Accordingly, the Court terminated several defendants from the action. Id.

On November 2, 2016, the State Defendants moved for judgment on the pleadings, State Mot., and on January 18, 2017, Carentz moved for Summary Judgment, Carentz Mot. Sawabini then cross-moved for summary judgment on February 21, 2017, Sawabini Cross-Mot., and on

May 15, 2017, the Bassett Defendants moved for summary judgment, Bassett Mot; McGrath Mot.

## III.   LEGAL STANDARD

### A.  Motion for Judgment on the Pleadings

A party may move for judgment on the pleadings under Federal Rule of Civil Procedure 12(c) any time after the close of pleadings but before trial. E.g., Calingo v. Meridian Res. Co., No. 11-CV-628, 2013 WL 1250448, at *2 (S.D.N.Y. Feb. 20, 2013). Rule 12(c) motions for judgment on the pleadings are decided by the same standard as Rule 12(b)(6) motions to dismiss for failure to state a claim. Hayden v. Paterson, 594 F.3d 150, 160 (2d Cir. 2010). Thus, to survive a Rule 12(c) motion, a pleading "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A court must accept as true the factual allegations contained in a pleading and draw all inferences in favor of the non-moving party. Allaire Corp. v. Okumus, 433 F.3d 248, 249–50 (2d Cir. 2006). Plausibility, however, requires "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [the alleged misconduct]." Twombly, 550 U.S. at 556. The plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556). "[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-[plaintiff]-unlawfully-harmed-me accusation." Id. (quoting Twombly, 550 U.S. at 555). Where a court is unable to infer more than the mere possibility of the alleged misconduct based on the pleaded

facts, the pleader has not demonstrated that she is entitled to relief and the action is subject to dismissal. Id. at 678–79.

**B. Motion for Summary Judgment**

Rule 56 of the Federal Rules of Civil Procedure instructs courts to grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Although "[f]actual disputes that are irrelevant or unnecessary" will not preclude summary judgment, "summary judgment will not lie if . . . the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also Taggart v. Time, Inc., 924 F.2d 43, 46 (2d Cir. 1991) ("Only when no reasonable trier of fact could find in favor of the nonmoving party should summary judgment be granted.").

The party seeking summary judgment bears the burden of informing the court of the basis for the motion and of identifying those portions of the record that the moving party claims will demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Similarly, a party is entitled to summary judgment when the nonmoving party carries the ultimate burden of proof and has failed "to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322.

In attempting to repel a motion for summary judgment after the moving party has met its initial burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). At the same time, a court must resolve all ambiguities and draw all

reasonable inferences in favor of the nonmoving party. <u>Reeves v. Sanderson Plumbing Prods.,</u> <u>Inc.</u>, 530 U.S. 133, 150 (2000); <u>Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.</u>, 164 F.3d 736, 742 (2d Cir. 1998). Thus, a court's duty in reviewing a motion for summary judgment is "carefully limited" to finding genuine disputes of fact, "not to deciding them." <u>Gallo v.</u> <u>Prudential Residential Servs., Ltd. P'ship</u>, 22 F.3d 1219, 1224 (2d Cir. 1994).

## IV.    DISCUSSION

### A.  The Bassett Defendants

The Bassett Defendants argue that summary judgment should be granted in their favor because they did not act under color of state law and Sawabini's confinement was based on probable cause and was therefore privileged. Dkt. No. 115-1 ("Bassett Memorandum") at 5, 11; Dkt. No. 116-1 ("McGrath Memorandum") at 4, 9. The Court finds that all of the Bassett Defendants except for Southworth were not acting under color of state law at the relevant times. Further, while the record currently before the Court mandates the conclusion that the Bassett Defendants have not met their burden on the question of qualified immunity, the Court will give them a chance to provide proper factual support on this issue before deciding whether Southworth is entitled to qualified immunity for his role in Sawabini's confinement.

#### 1.  Acting Under Color of State Law

"To state a claim under § 1983, a plaintiff must allege that defendants violated plaintiff's federal rights while acting under color of state law." <u>McGugan v. Aldana-Bernier</u>, 752 F.3d 224, 229 (2d Cir. 2014). A private entity acts under color of state law when

> (1) the entity acts pursuant to the "coercive power" of the state or is
> "controlled" by the state ("the compulsion test"); (2) when the state
> provides "significant encouragement" to the entity, the entity is a

> "willful participant in joint activity with the [s]tate," or the entity's functions are "entwined" with state policies ("the joint action test" or "close nexus test"); or (3) when the entity "has been delegated a public function by the [s]tate," ("the public function test").

Sybalski v. Indep. Grp. Home Living, Inc., 546 F.3d 255, 257 (2d Cir. 2008) (alterations in original) (quoting Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n, 531 U.S. 288, 296 (2001)).

The Bassett Defendants argue that they did not act under color of state law because they are private individuals who work at a private hospital. Bassett Mem. at 6–9; McGrath Mem. at 4–7. Courts in this circuit have consistently held that private individuals confining persons pursuant to the New York Mental Hygiene Law do not act under color of state law. McGugan, 752 F.3d at 229 (answering in the negative the question "whether private health care professionals or a private hospital engage in state action when they forcibly medicate and hospitalize someone deemed to have a mental illness likely to result in serious harm"); Hogan v. A.O. Fox Mem'l Hosp., 346 F. App'x 627, 629 (2d Cir. 2009) ("Fox Hospital is a private hospital; Dr. Ongjoco is a private physician; and their conduct does not fall within any of the tests for determining when private conduct can be attributed to the State."); Antwi v. Montefiore Med. Ctr., No. 14-CV-840, 2014 WL 6481996, at *5 (S.D.N.Y. Nov. 18, 2014) ("[I]t is well-settled in the Second Circuit that a private hospital confining a patient under the New York MHL is not acting under color of state law." (collecting cases)); Doe v. Rosenberg, 996 F. Supp. 343, 356 (S.D.N.Y. 1998) ("The application of the state compulsion, close nexus/joint action, and public function tests establish that the MHL, at most, provides a licensing provision enabling the private hospital to receive mental patients. Licensing and regulations are insufficient to

transform the Hospital Defendants into state actors for § 1983 purposes."), aff'd, 166 F.3d 507 (2d Cir. 1999). Thus, assuming that the Bassett Defendants are private individuals who confined Sawabini under the New York Mental Hygiene Law, they cannot be held liable under § 1983.

It is true that none of the Bassett Defendants present evidence that Bassett Hospital is a private hospital or that they are private individuals. They merely state that they work at the Hospital. See McGrath Decl. ¶ 1 ("I am the Senior Director of Operations at O'Connor Hospital . . . ."); Southworth Decl. ¶ 1 ("I am the Network Manager of Public Safety for the Bassett Healthcare Network."); McCarthy Decl. ¶ 1 ("I am a registered Nurse at Bassett Medical Center."); Hodgman Decl. ¶ 1 ("I am an Attending Physician at Bassett Medical Center."). Nevertheless, "as to issues on which the non-moving party bears the burden of proof, the moving party may simply point out the absence of evidence to support the non-moving party's case." Nora Beverages, Inc. v. Perrier Grp. of Am., Inc., 164 F.3d 736, 742 (2d Cir. 1998) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986)). Sawabini bears the burden of showing that the Bassett Defendants were state actors. See Hadges v. Yonkers Racing Corp., 918 F.2d 1079, 1082 n.3 (2d Cir. 1990) ("Under § 1983, . . . [the plaintiff] bears the burden of proof on the state action issue."). Accordingly, the Bassett Defendants' claim in their memoranda that Sawabini cannot establish that they were state actors is enough to shift the burden to Sawabini on this issue. See, e.g., Feurtado v. City of New York, 337 F. Supp. 2d 593, 599 (S.D.N.Y. 2004) ("[T]he City's assertion in its brief that there is no evidence of a Monell violation required [the plaintiff] to furnish admissible evidence in support of his claim.").

Sawabini raises several arguments as to why the Bassett Defendants were acting under color of state law. He argues that the Bassett Defendants were state actors because the hospital is

extensively regulated and receives federal funding. Dkt. No. 117-3 ("Sawabini Opposition") at 20, 39, 45.[5] Sawabini does not produce any admissible evidence to support this assertion. See Hooker v. Fournier, 29 F. App'x 641, 643 (2d Cir. 2002) ("[M]ere conclusory allegations . . . in legal memoranda . . . are not evidence and cannot by themselves create a genuine issue of material fact where none would otherwise exist." (second alteration in original) (quoting Fletcher v. Atex, Inc., 68 F.3d 1451, 1456 (2d Cir. 1995))). But even assuming that the hospital is heavily regulated and receives federal funding, this is insufficient to show the Bassett Defendants acted under color of state law. See Jackson v. Metro. Edison Co., 419 U.S. 345, 350 (1974) ("The mere fact that a business is subject to state regulation does not by itself convert its action into that of the State for purposes of the Fourteenth Amendment."); McGugan, 752 F.3d at 229 ("[A]lthough Defendants operated in a highly regulated context, the nexus between their challenged conduct and the state was insufficiently close for the conduct to qualify as state action."); Mele v. Hill Health Ctr., 609 F. Supp. 2d 248, 257 (D. Conn. 2009) ("The mere fact that [the defendants] . . . receive federal funding, and may receive state funding, does not necessarily make [them] . . . state actor[s].").

Sawabini argues that McCarthy was acting under color of state law because she commanded the Sidney Police Department to confine him. Sawabini Opp'n at 23. To support this assertion, Sawabini merely alleges in his declaration that McCarthy effectuated the false arrest in this manner. Sawabini Opp'n Decl. at 8. The Court does not need to address this argument because Sawabini fails to establish that he had personal knowledge of McCarthy's conduct at the relevant times; thus, his bare assertion that she directed the police to confine him does not create

---

[5]  The page numbers for this document refer to those generated by ECF.

a genuine dispute of material fact. See Bain v. Wal-Mart Stores, Inc., 585 F. Supp. 2d 449, 452 (W.D.N.Y. 2008) ("Affidavits submitted in opposition to summary judgment must be based on personal knowledge from a competent source, and 'set forth such facts as would be admissible in evidence.'" (quoting Patterson v. County of Oneida, 375 F.3d 206, 219 (2d Cir. 2004))).

Additionally, Sawabini argues that McGrath acted under color of state because he set in motion the events that led to Sawabini's confinement. E.g., Sawabini Opp'n at 49. McGrath did report Sawabini's threatening statements to Dr. Johns, McGrath Decl. ¶ 4, which arguably began the process that ultimately led to Sawabini's confinement. But at least one court has explicitly rejected this theory of state action for reasons this Court finds persuasive. See Rosenberg, 996 F. Supp. 343, 357 (S.D.N.Y. 1998) ("[Plaintiff's] contention that [defendant] should be deemed a state actor because it was his actions that set in motion the events that eventually led to her civil commitment cannot be sustained."). As the Rosenberg court explained, if this theory of state action were adopted, "[a] mother who brings her disturbed daughter to CPMC for psychiatric evaluation would be subject to § 1983 liability." Id. That "is neither practical nor legally valid." Id.

Further, Sawabini argues that the Bassett Defendants conspired with Dr. Johns, the Director of Community Services for several New York counties, to have him confined in an effort to cover up widespread Medicare fraud and to retaliate against Sawabini for attempting to report the hospital for safety violations. Sawabini Opp'n at 37–38, 41. A private person who jointly engages in an act with a state employee may be held to act under color of state law. Dennis v. Sparks, 449 U.S. 24, 27–28 (1980). "In order to establish a § 1983 conspiracy claim, a plaintiff must allege '(1) an agreement between a state actor and a private party; (2) to act in

concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages.'" Walker v. Tormey, 178 F. Supp. 3d 53, 65–66 (N.D.N.Y. 2016) (Kahn, J.) (quoting Ciambriello v. County of Nassau, 292 F.3d 307, 324–25 (2d Cir. 2002)).

Courts have held that a Director of Community Services may be considered a state actor for § 1983 purposes. See, e.g., Johnson v. Unity Health Sys., No. 08-CV-6258, 2010 WL 1404123, at *4 (W.D.N.Y. Mar. 30, 2010) (finding that a defendant who was Director of Community Services qualified as a state actor because, among other things, "absent his designation by the county Director of Community Services, [the] defendant . . . would not have been able to authorize local police officers to take [the] plaintiff into custody and transport her against her wishes to a psychiatric hospital for evaluation."). Thus, if Sawabini could produce admissible evidence that the Bassett Defendants conspired with Dr. Johns to deprive him of his constitutional rights, that might suffice to defeat the Bassett Defendants' summary judgment motion. Sawabini has not met his burden on this issue. The only evidence he has offered on this score is his entirely conclusory allegation that Southworth "poisoned" the mind of Dr. Johns, who then conspired to confine Sawabini. Sawabini Opp'n at 20, 24, 33, 36–37, 46. There is no explanation as to how Sawabini came to acquire this knowledge. Thus, Sawabini's conclusory assertion cannot raise a genuine dispute of fact as to any conspiracy between Dr. Johns and the other defendants. See Maloney v. County of Nassau, 500 F. App'x 30, 33 (2d Cir. 2012) ("Maloney's claim against Seiden fails for insufficient evidence to permit a reasonable jury to conclude that Seiden took any actions in concert with the police with knowledge of a scheme to deprive Maloney of constitutional rights and the intent to further such a scheme."); Mitchell v. County of Nassau, 786 F. Supp. 2d 545, 565 (E.D.N.Y. 2011) ("A § 1983 conspiracy claim based

on conclusory allegations and unsubstantiated statements may not withstand a summary judgment motion where 'the record is devoid of any proof of an agreement among Defendants to act in concert to violate Plaintiff['s] constitutional rights.'" (alteration in original) (quoting Rose v. Julliano, No. 05-CV-2732, 2008 WL 5233178, at *7 (E.D.N.Y. Dec. 8, 2008))).

Finally, Sawabini alleges that Southworth acted under color of state law because he is an officer of the peace. Sawabini Opp'n at 22, 34–35, 43, 46, 70. In support of this assertion, Sawabini attaches a copy of the section 9.45 form used to involuntarily commit him. Dkt. No. 117-4 ("Sawabini Exhibits") at 9.[6] The form reveals that Dr. Johns received information about Sawabini from Southworth, "who is a peace officer with appropriate special duties." Id. Southworth's status as a peace officer, combined with his use of that status to set in motion Sawabini's confinement, is sufficient to allow a reasonable jury to conclude that Southworth was acting under color of state law. See, e.g., Schindler v. French, 232 F. App'x 17, 19 (2d Cir. 2007) ("Plaintiffs' complaint sufficiently alleges that defendants Spinato and Sasse were acting under color of state law because they were allegedly acting as 'duly authorized peace officers' and exercising authority conferred by state law by virtue of their status as peace officers."); Lee v. Kitchen, No. 16-CV-829, 2017 WL 1968325, at *3 (W.D.N.Y. May 11, 2017) ("Allegations that an individual was acting as a duly authorized peace officer are sufficient to allege that the individual was acting under color of state law."). Thus, unlike the other Bassett Defendants, Southworth cannot be dismissed from this case on the ground that he was not a state actor.

---

[6] The page numbers for this document refer to those generated by ECF.

### 2. *False Arrest and Qualified Immunity*

The Bassett Defendants argue that they "are entitled to qualified immunity because any mental hygiene arrest of [Sawabini] was objectively reasonable, and accordingly based on probable cause." Bassett Mem. at 13. Since Southworth is the only Bassett defendant who cannot be dismissed on state-actor grounds, the Court need only determine whether he is entitled to qualified immunity. The Court concludes that, on the record currently before it, Southworth cannot receive qualified immunity for his conduct in relation to Sawabini's confinement. Nonetheless, it reserves decision on this aspect of the Bassett Defendants' summary judgment motion pending receipt of additional evidentiary material.

The Fourth Amendment's protection against unreasonable searches and seizures "adheres whether the seizure is for purposes of law enforcement or due to an individual's mental illness." Myers v. Patterson, 819 F.3d 625, 632 (2d Cir. 2016). The elements for a claim of false arrest under § 1983, which "rest[s] on the Fourth Amendment right of an individual to be free from unreasonable seizures," are substantially the same as those under New York law. Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996). In order to succeed on a claim for false arrest, the plaintiff must demonstrate that "(1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged." Savino v. City of New York, 331 F.3d 63, 75 (2d Cir. 2003) (quoting Bernard v. United States, 25 F.3d 98, 102 (2d Cir. 1994)). "Under New York law, the existence of probable cause is an absolute defense to a false arrest claim." Jaegly v. Couch, 439 F.3d 149, 152 (2d Cir. 2006).

"To handcuff and detain, even briefly, a person for mental-health reasons, an officer must have 'probable cause to believe that the person presented a risk of harm to [her]self or others.'" Myers, 819 F.3d at 632 (alteration in original) (quoting Kerman v. City of New York, 261 F.3d 229, 237 (2d Cir. 2001)). "[A] showing of probable cause in the mental health seizure context requires only a 'probability or substantial chance' of dangerous behavior, not an actual showing of such behavior." Hoffman v. County of Delaware, 41 F. Supp. 2d 195, 209 (N.D.N.Y. Mar. 12, 1999) (quoting Monday v. Oullette, 118 F.3d 1099, 1102 (6th Cir. 1997)). "Probable cause for involuntary hospitalization may be established from 'information gleaned from informants[,] . . . normally the putative victim or eyewitness, unless the circumstances raise doubt as to the person's veracity.'" Hicks v. City of New York, No. 12-CV-5081, 2015 WL 5774575, at *5 (E.D.N.Y. Aug. 27, 2015) (alterations in original) (quoting Estate of Heilbut ex rel. Rangel v. City of New York, No. 04-CV-4332, 2006 WL 2807722, at *4 (S.D.N.Y. Oct. 2, 2006)). "For Fourth Amendment purposes, the reasonableness of an officer's belief must be assessed in light of the particular circumstances confronting the officer at the time." Tsesarskaya v. City of New York, 843 F. Supp. 2d 446, 456 (S.D.N.Y. 2012) (quoting Kerman, 261 F.3d at 235).

Qualified immunity shields government officials from civil damages liability as long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. Reichle v. Howards, 132 S. Ct. 2088, 2093 (2012); see also Pearson v. Callahan, 555 U.S. 223, 231 (2009); Sudler v. City of New York, 689 F.3d 159, 174 (2d Cir. 2012). The law of qualified immunity seeks to strike a balance between "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield

officials from harassment, distraction, and liability when they perform their duties reasonably." Pearson, 555 U.S. at 231. Government officials are shielded from liability by qualified immunity if they make "reasonable mistakes" about the lawfulness of their conduct. Sudler, 689 F.3d at 174 (citing Saucier v. Katz, 533 U.S. 194, 206 (2001), abrogated on other grounds by Pearson, 555 U.S. 223).

"An officer is entitled to qualified immunity against a suit for false arrest if he can establish that he had 'arguable probable cause' to arrest the plaintiff." Garcia v. Does, 779 F.3d 84, 92 (2d Cir. 2015) (quoting Zalaski v. City of Hartford, 723 F.3d 382, 390 (2d Cir. 2013)). "Arguable probable cause exists 'if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met.'" Escalera v. Lunn, 361 F.3d 737, 743 (2d Cir. 2004) (quoting Golino v. City of New Haven, 950 F.2d 864, 870 (2d Cir. 1991)). "[T]o determine whether a mental-health seizure is justified by arguable probable cause, a court must review the specific observations and information available to the officers at the time of a seizure." Myers, 819 F.3d at 633. "Because qualified immunity is an affirmative defense, defendants bear the burden of showing that there was arguable probable cause." Tsesarskaya, 843 F. Supp. 2d at 459 (collecting cases).

Here, Southworth learned from McGrath that Sawabini "was engaged in a pattern of behavior that employees at O'Connor hospital found to be threatening." Southworth Decl. ¶ 3. McGrath told Southworth that Sawabini "had called members of O'Connor's staff multiple times even after being advised to stop doing so." Id. ¶ 4. Southworth also learned that McGrath had sent Sawabini a letter requesting him to stop making threatening calls. Id. ¶ 6. Later, an employee

at a different hospital affiliated with Bassett, "who was unaware of [Sawabini's] conduct toward O'Connor Hospital Employees," told Southworth that Sawabini had made threatening statements over the phone. Id. ¶ 7. Southworth then told Dr. Johns that he had concluded, "based on [his] training and experience, that [Sawabini] presented a substantial risk of harm to himself or others." Id. ¶ 9.

The problem for Southworth is that the Bassett Defendants fail to point to any evidence in the record suggesting that Southworth was specifically aware that Sawabini's threats reflected the possibility of violence. As just noted, the Bassett Defendants refer to evidence suggesting that Southworth learned that Sawabini had spoken to certain hospital employees in what they considered to be a threatening manner. E.g., Bassett SMF ¶¶ 2–5. But the question is whether Southworth had arguable probable cause to believe Sawabini was "dangerous to himself or to others," Anthony v. City of New York, 339 F.3d 129, 137 (2d Cir. 2003), and without any record evidence suggesting that the threatening comments on which Southworth relied involved any suggestion of violence, the Court cannot make that determination. See Greenaway v. County of Nassau, 97 F. Supp. 3d 225, 234, 240–41 (E.D.N.Y. 2015) (holding that the defendant-officers, who confined and tased the plaintiff, lacked probable cause and were not entitled to qualified immunity because, among other things, they failed to "show that making gestures that some officers interpreted as 'threatening' is clearly grounds for involuntary hospitalization as a matter of law").[7]

_____

[7] The Bassett Defendants do cite a page in Sawabini's Amended Complaint in which he appears to allege McGrath falsely told Southworth that Sawabini had called the hospital and said Barbara Greene's "days were numbered." Am. Compl. at 24; see also Bassett SMF ¶ 2. But the context of that remark, discussed below, shows that a reasonable jury could interpret it is as suggesting merely that Greene would soon lose her position in the hospital's human resources

After all, not all threats are threats of violence. One might threaten to file a civil rights lawsuit against a hospital for alleged discrimination, or to report the hospital for alleged Medicare fraud. Hospital employees may find such statements inappropriate, and if the threats are repeated often enough, such employees may feel the need to report the person making them to security. Yet such statements would not provide an officer with arguable probable cause to believe that the individual poses a risk of physical harm to himself or to others such that involuntary commitment would be appropriate. Cf. Burdick v. Johnson, No. 06-CV-1465, 2009 WL 1707475, at *6 (N.D.N.Y. June 17, 2009 (Kahn, J.) ("Here, it is clear that the Defendants had probable cause to [involuntarily commit] the Plaintiff. . . . When Plaintiff called 911, he was extremely upset, ranting and raving, and threatening to "shoot" and "wipe out" a police officer."). The Court is not deciding that Sawabini's statements were of this nature. But the question here is whether "the undisputed facts and all permissible inferences favorable to the plaintiff show . . . that officers of reasonable competence could disagree on whether the probable cause test was met [or that it was objectively reasonable for the officer to believe that probable cause existed]." McClellan v. Smith, 439 F.3d 137, 147–48 (2d Cir. 2006) (first alteration in original) (emphasis omitted) (quoting Robinson v. Via, 821 F.2d 913, 921 (2d Cir. 1987)). The Court notes only that, based on the record before it and drawing the reasonable inference that Sawabini's threats did not involve any suggestion of violence, "'no reasonably competent officer' could have concluded . . . that probable cause existed" to believe that Sawabini presented a danger to himself or to others. Figueroa v. Mazza, 825 F.3d 89, 100 (2d Cir. 2016) (quoting Malley v Briggs, 475 U.S. 335, 341 (1986)).

department.

The Bassett Defendants' failure to point to any evidence suggesting that Southworth—or, for that matter, any other Bassett defendant—was aware of violent threats made by Sawabini would in itself suffice to warrant denying qualified immunity to Southworth. That is because, "[w]hile the trial court has discretion to conduct an assiduous review of the record in an effort to weigh the propriety of granting a summary judgment motion, it is not required to consider what the parties fail to point out." Monahan v. N.Y.C. Dep't of Corrs., 214 F.3d 275, 292 (2d Cir. 2000) (quoting Downes v. Beach, 587 F.2d 469, 472 (10th Cir. 1978)); see also Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record."). Nevertheless, the Court has conducted its own review of the record in an attempt to determine the content of Sawabini's phone calls. Sawabini himself attached an exhibit to his Amended Complaint that contains some details about these conversations. Am. Compl. at 56. On one occasion, Sawabini noted his anger at Barbara Green, a human resources manager at O'Connor who had failed to send him an application for an open position, and then stated that he was "going to the commissioner" and that "Her days are numbered." Id. In the same conversation, Sawabini "also said to 'be prepared' because there was going to be 'a shakeup' in O'Connor's staff." Id. The next day, Sawabini called the human resources department, again to complain about not receiving an application, and said, "You don't want to hire me for this position? I know so many things, pharmaceutical things, making bombs, emergency work." Id. Finally, a few days later, Sawabini called the hospital again and "began to make disparaging comments about Bassett. His conversation became rambling and incoherent: he talked of how the Russians were eating gold and how they wanted to blow up the world. He said he knew about that stuff and that he could save things." Id.

Even if the Bassett Defendants had pointed to this exhibit in Sawabini's Amended Complaint, Southworth would still not receive qualified immunity on the record before the Court. Of the statements just described, the only one that arguably contains a threat of violence is Sawabini's assertion that he knows how to build bombs. Am. Compl. at 56. The other statements, while clearly inappropriate and likely probative of mental illness, do not support an inference that Sawabini posed a threat of physical violence to himself or to others. The trouble is that the Court is left to guess as to which of these statements Southworth had knowledge of. Again, Southworth avers merely that he learned of allegedly threatening statements made by Sawabini. Southworth Decl. ¶¶ 3–7. Southworth does not specify the content of these statements. Thus, a reasonable jury could conclude that he had heard only those statements that did not reflect a possibility of violent conduct on Sawabini's part.[8] Moreover, none of the other declarations submitted with the Bassett Motion clarifies the content of Sawabini's allegedly threatening statements.[9] Thus, the Court cannot conclude at this juncture that, based on "the facts

---

[8]  Indeed, as noted above, the Bassett Defendants' citation to Sawabini's Amended Complaint suggests only that Southworth knew of Sawabini's statement regarding a "shakeup" in the hospital's staff that would lead to Greene's "days [being] numbered." Am. Compl. at 24, 56. No reasonable officer would conclude that he had probable cause to involuntarily confine someone on the basis of those statements alone.

[9]  While the Bassett Defendants do not raise the argument, they cannot at this point claim qualified immunity on the basis of the "collective knowledge doctrine[, which] provides that, for the purpose of determining whether an arresting officer had probable cause to arrest, 'where law enforcement authorities are cooperating in an investigation, . . . the knowledge of one is presumed shared by all.'" Savino v. City of New York, 331 F.3d 63, 74 (2d Cir. 2003) (quoting Illinois v. Andreas, 463 U.S. 765, 772 n.5 (1983)). The reason is that, as just noted, none of the declarations submitted by the Bassett Defendants specify the content of Sawabini's purportedly threatening remarks, and the Bassett Defendants fail to point to other record evidence suggesting that any of them were specifically aware of violent threats made by Sawabini. Thus, the Court cannot infer that any of the Bassett Defendants knew that Sawabini had threatened violence to himself or to others.

known to [Southworth and the other Bassett defendants]," <u>Zalaski v. City of Hartford</u>, 723 F.3d 382, 393 (2d Cir. 2013), there was arguable probable cause to detain Sawabini.

Further, the Bassett Defendants cite several cases in support of the proposition that "[p]robable cause in the mental health context repeatedly has been found where officials receive reports that a patient is engaged in behavior perceived to be threatening." Bassett Mem. at 10. Yet unlike the present case, these cases all involved defendants who learned that the plaintiffs had either engaged in violent behavior or had threatened violence. <u>See</u> <u>Glass v. Mayas</u>, 984 F.2d 55, 57–58 (2d Cir. 1993) (holding that the defendants were entitled to qualified immunity because, among other things, the plaintiff "was hospitalized following two reports that he was threatening an individual with a gun and observations of strange behavior"); <u>Hoffman v. County of Delaware</u>, 41 F. Supp. 2d 195, 209–210 (N.D.N.Y. 1999) (finding that there was "probable cause to issue a pick-up order" because the defendant had learned, inter alia, that the plaintiff "threatened violence towards certain city officials"); <u>Richardson v. Nassau Cty. Med. Ctr.</u>, 840 F. Supp. 219, 220–22 (E.D.N.Y. 1994) (holding that "it was objectively reasonable for the defendants, after examining [the plaintiff], to authorize an involuntary commitment of him" because the examination revealed that he was psychotic, that he "carried knives to protect himself from 'professional cons' and that two weeks prior, he had jumped someone to show that no one should fool with him"); <u>Higgins v. City of Oneonta</u>, 617 N.Y.S.2d 566, 568–69 (App. Div. 1994) (finding that the plaintiff's confinement was privileged where one of the defendants learned from the plaintiff's psychiatrist that the plaintiff "ha[d] been more depressed and earlier today he said that he really felt a lot more like killing the people that were responsible [for his termination from the police force]").

Although the record currently before the Court shows that the Bassett Defendants have not met their burden on the question of qualified immunity, the Court elects not to rule that Southworth cannot receive qualified immunity at this juncture. Under Rule 56(e)(1) of the Federal Rules of Civil Procedure, "[i]f a party fails to properly support an assertion of fact . . . the court may[] give an opportunity to properly support . . . the fact." Moreover, "[t]he 2010 Advisory Committee Notes inform the Court that '[b]efore deciding on other possible action,' affording the movant an opportunity to support or address a fact is '[i]n many circumstances . . . the court's preferred first step." Capps v. Cremation Options, Inc., No. 12-CV-545, 2015 WL 12656928, at *1 (E.D. Tenn. Dec. 10, 2015) (second, third, and fourth alterations in original) (quoting Fed. R. Civ. P. 56(e) 2010 advisory committee's note to 2010 amendment). The Bassett Defendants have failed to properly support their assertion that they were aware of threats suggesting that Sawabini posed a risk of physical harm to himself or to others. Accordingly, the Court exercises its discretion to allow the Bassett Defendants to submit affidavits or other materials remedying this evidentiary gap. See, e.g., Parks v. Blanchette, No. 09-CV-604, 2015 WL 1970526, at *1–2 (D. Conn. May 1, 2015) (invoking Rule 56(e)(1) to allow the defendants to resubmit affidavits from fact witnesses that failed to specify that they were based on personal knowledge); see also Myers, 819 F.3d at 636 ("Given that [the defendant] . . . has failed to show facts that would entitle him to qualified immunity, we would ordinarily simply reverse the grant of qualified immunity and remand for trial. But, in view of the fact that the record was so inadequately developed by counsel, . . . we think the purposes of qualified immunity would be better served by a remand for further development of the record and reconsideration of the question in light of the expanded record."). The Bassett Defendants must

submit such materials within fourteen days of this Memorandum-Decision and Order. Sawabini may file a response to the Bassett Defendants' supplemental submissions within fourteen days of these defendants' filing.

### B. Carentz

Carentz moves for summary judgment on the ground that he had no involvement with Sawabini's confinement and did not act under color of state law. Dkt. No. 104-4 ("Carentz Memorandum") at 4; see also Dkt. No. 104-2 ("Carentz Affidavit") ¶¶ 4–8.[10] In its September Order, this Court, faced with the ambiguity of Sawabini's pleadings, concluded that Sawabini was alleging that Carentz was present during the confinement. Sept. Order at 34. But in Sawabini's affidavit submitted in response to Carentz's summary judgment motion, Sawabini amends his theory of Carentz's involvement, asserting that Carentz conspired with the Bassett Defendants to have Sawabini confined while Carentz was on vacation in Florida. Sawabini Cross-Mot. Aff. at 6–7. The problem is that Sawabini has produced no admissible evidence supporting this assertion. There is no explanation of how Sawabini would know what Carentz was doing while in Florida, and Sawabini does not say how he learned of the alleged conspiracy between Carentz and the Bassett Defendants. Thus, since there is no indication that Sawabini had personal knowledge of Carentz's activities in the period leading up to Sawabini's confinement, he has not rebutted Carentz's sworn assertion that he had no involvement in the confinement. See, e.g., Vega v. Western, No. 10-CV-6131, 2011 WL 4600599, at *3 (S.D.N.Y. Oct. 6, 2011) ("Putting aside the fact that [the plaintiff's] 56.1 statement is not sworn and is thus inadmissible, [plaintiff's] assertion does not explain how [he] has any personal knowledge that [the defendant]

---

[10]  The page numbers for this document refer to those generated by ECF.

gave such an order and thus it carries no weight."), adopted by 2012 WL 523617 (S.D.N.Y. Feb. 16, 2012); Verri v. Nanna, 972 F. Supp. 773, 788 (S.D.N.Y. 1997) ("[T]his type of assertion, based not upon personal knowledge but solely upon conjecture, is insufficient to defeat a motion for summary judgment."). Accordingly, the Court grants Carentz's motion.

## C. The State Defendants

In moving for judgment on the pleadings, the State Defendants argue that (1) Sawabini failed to properly serve them, (2) his procedural due process claim fails on the merits, (3) his claims are barred by the Eleventh Amendment, and (4) the individual state defendants have qualified immunity. Dkt. No. 82-1 ("State Memorandum") at 5–10. The Court need not address the State Defendants' arguments regarding service, the Eleventh Amendment, or qualified immunity, because no reasonable jury could conclude that they violated Sawabini's right to procedural due process.

### 1. Procedural Due Process

The procedural component of the Due Process Clause prevents the deprivation of a protected interest absent the provision of sufficient procedural protections. Courts evaluate procedural due process claims using a two-prong test: "(1) whether plaintiffs possessed a protected liberty or property interest, and, if so, (2) what process plaintiffs were due before they could be deprived of that interest." Adams v. Suozzi, 517 F.3d 124, 127 (2d Cir. 2008) (quoting Sealed v. Sealed, 332 F.3d 51, 55 (2d Cir. 2003)); see also Zinermon v. Burch, 494 U.S. 113, 126 (1990) ("[T]o determine whether a constitutional violation has occurred, it is necessary to ask what process the State provided, and whether it was constitutionally adequate.").

"Property interests are not created by the Constitution, but instead, are created and defined by existing rules or understandings 'stemming from an independent source,' which source supports a 'legitimate claim of entitlement.'" Barnes v. Pilgrim Psychiatric Ctr., 860 F. Supp. 2d 194, 201 (E.D.N.Y. 2012) (quoting Bd. of Regents of State Colls. v. Roth, 408 U.S. 564, 577 (1972)). Courts "look[] to state law to determine the source of a Constitutionally protected property right." Id. "Once such a property right is found, [a court] must determine whether that property right 'constitutes a property interest for purposes of the Fourteenth Amendment.'" O'Connor v. Pierson, 426 F.3d 187, 196 (2d Cir. 2005) (quoting Town of Castle Rock v. Gonzales, 545 U.S. 748, 756 (2005)). If the court determines that the property right qualifies for protection under the Fourteenth Amendment, "[t]he second step of the analysis . . . asks what process was due to the plaintiff, and inquires whether that constitutional minimum was provided in the case under review." Narumanchi v. Bd. of Trs. of Conn. State Univ., 850 F.2d 70, 72 (2d Cir. 1988) (citing Mathews v. Eldridge, 424 U.S. 319 (1976)).

Sawabini has a constitutionally protected property interest in the causes of action arising out of the discrimination he allegedly experienced. See N.Y. State Nat'l Org. for Women v. Pataki, 261 F.3d 156, 163 (2d Cir. 2001) ("There is no dispute that a legal cause of action constitutes a 'species of property protected by the Fourteenth Amendment's Due Process Clause.'" (quoting Logan v. Zimmerman Brush Co., 455 U.S. 422, 428 (1982))). Further, the Court will assume for purposes of deciding this motion that the DHR's failure to adequately investigate his discrimination complaint deprived Sawabini of his constitutionally protected property interest. See Alloul v. City of New York,  No. 09-CV-7726, 2010 WL 5297215, at *6 (S.D.N.Y. Dec. 21, 2010) ("Accordingly, for purposes of the present motion, the Court must

assume that . . . the City deprived [the plaintiff] of a constitutionally-protected property interest.").

The Court now turns to determine the process to which Sawabini was entitled, an inquiry that depends on whether the deprivation at issue resulted from "established state procedures" or "random, unauthorized acts by state employees." Hellenic Am. Neighborhood Action Comm. v. City of New York, 101 F.3d 877, 880 (2d Cir. 1996). "A deprivation effectuated through the random and unauthorized acts of government officials, as opposed to via established state procedures, does not violate procedural due process 'so long as the [government] provides a meaningful postdeprivation remedy.'" Polito v. City of New York, the Dep't of Health, No. 15-CV-2301, 2016 WL 3676425, at *5 (E.D.N.Y. July 7, 2016) (alteration in original) (quoting Hellenic Am. Neighborhood Action Comm., 101 F.3d at 880). On the other hand, "[w]hen the deprivation occurs in the more structured environment of established state procedures, rather than random acts, the availability of postdeprivation procedures will not, ipso facto, satisfy due process." Hellenic Am. Neighborhood Action Comm., 101 F.3d at 880 (citing Hudson v. Palmer, 468 U.S. 517, 532 (1984)).

The Supreme Court has held that the DHR's "panoply of procedures, complemented by administrative as well as judicial review, is sufficient under the Due Process Clause." Kremer v. Chem. Constr. Corp., 456 U.S. 461, 484 (1982). Therefore, if Sawabini was denied procedural due process, it was as a result of the random and unauthorized acts of DHR employees, and not because of an established state policy. See Devany v. County of Nassau, No. 88-CV-0657, 1989 WL 18748, at *6 (E.D.N.Y. Feb. 16, 1989) ("[Plaintiff] cannot challenge the totality of New York's procedure for dealing with human rights complaints as constitutionally defective. At

most, he can complain that he was denied constitutionally safeguarded rights because of the 'random and unauthorized' acts of discrete state officials."), aff'd, 888 F.2d 125 (2d Cir. 1989).

Sawabini alleges that the DHR's decision regarding his discrimination complaint was "[c]apricious, arbitrary, and abusive." Am. Compl. at 27. He alleges that numerous parties lied during the course of the DHR inquiry and that the DHR considered evidence where various defendants admitted to the alleged conduct. Id. at 20, 22, 28. And he states that DeAmelia's decisions were faulty, pointing to her failure to investigate several claims that were relevant to the confinement. Id. at 47–48. Torres, for his part, allegedly failed to swear in Greene, McGrath, and Jane Doe 1, and did not read Sawabini's rebuttal. Id. at 47. Sawabini also alleges that Downey was complicit in preventing him from having his case heard in front of the DHR, and that Downey failed to appear in the state court proceedings. Id. at 28, 45, 48, 50–51. These allegations all suggest that Sawabini suffered a deprivation in his property interest as a result of actions taken by individual defendants.

Thus, Sawabini has received all the process he is due if there was a meaningful postdeprivation remedy available to him. Such was the case, for as the Devany court noted, "[t]he Supreme Court has expressly recognized that in cases involving complaints to the State Division of Human Rights, 'the Appellate Division is available to assure that a claimant is not denied any of the procedural rights to which he was entitled' and that the State Division's 'determination was not arbitrary and capricious.'" 1989 WL 18748, at *6 (quoting Kremer, 456 U.S. at 484). Whether or not Sawabini actually took advantage of this postdeprivation remedy is irrelevant. See Rivera-Powell, 470 F.3d at 467 n.9 ("The fact that Rivera-Powell failed properly to pursue the state court action, and that it is now too late to do so, does not affect our due process

analysis . . . ."). Since New York state law provides an adequate postdeprivation remedy for any deprivation Sawabini suffered, his due process claim fails and the State Defendant's motion for summary judgment is granted.

## V.      CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that the State Defendants' motion for judgment on the pleadings (Dkt. No. 82) is **GRANTED**; and it is further

**ORDERED**, that the Bassett Defendants' motions for summary judgment (Dkt. Nos. 115, 116) are **GRANTED in part** as to McCarthy, Hodgman, and McGrath, and that the Court reserves decision on such motions to the extent that they involve Southworth's role in Sawabini's confinement; and it is further

**ORDERED**, that within **fourteen days** of this Memorandum-Decision and Order, the Bassett Defendants shall submit additional evidentiary material, not to exceed **ten pages**, that properly supports their assertion that they were aware of threats made by Sawabini that suggested he was a danger to himself or to others, and that Sawabini may file a response, not to exceed **ten pages**, to this supplemental material within **fourteen days** of the Bassett Defendants' filing; and it is further

**ORDERED**, that Carentz's motion for summary judgment (Dkt. No. 104) is **GRANTED**; and it is further

**ORDERED**, that Sawabini's cross-motion for summary judgment (Dkt. No. 106) is **DENIED**; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Memorandum-Decision and

Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**


DATED:      August 28, 2017
            Albany, New York




_____
Lawrence E. Kahn
U.S. District Judge